

# The Commonwealth of Massachusetts

William Francis Galvin, Secretary of the Commonwealth

Corporations Division

March 19, 2014

Santander Bank
824 North Market Street
Suite 100
Wilmington, DE 19801

Pursuant to Massachusetts General Laws, Chapter 156D § 15.10, you are hereby notified that legal process against the above-named corporation has been served upon me on **March 19, 2014 at 2:00 p.m.** in the case of:

Plaintiff(s):   Mark G Bulman

Defendant(s):  Santander Bank

Damages as set forth at **Suffolk Superior Court 14-0828 F**
within 20 days after service of this summons upon you, exclusive of the day of service.

Copy of legal process attached hereto.

**WILLIAM FRANCIS GALVIN**
**SECRETARY OF THE**
**COMMONWEALTH**

**SUFFOLK, ss.**



# Commonwealth of Massachusetts

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. ___14-0828___ F

MARK G BULMAN _____ , Plaintiff(s)

v.

SANTANDER (SOVEREIGN) BANK _____ , Defendant(s)

## SUMMONS AND ORDER OF NOTICE

To the above-named Defendant:            **SANTANDER (SOVEREIGN) BANK**

You are hereby summoned and required to serve upon____**Robert K Cabana**____

plaintiff's attorney, whose address is _1354 Hancock St Quincy Mass  02169_____

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said `Crm 314` Boston of our said court on_____Tuesday_____ the _twenty-fifth_____ day of ___March_____ A.D. 201_4_, at _____two_____ o'clock pA.M., at which time you may appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, at Boston, the _____thirteenth_____ day of _March_____ , in the year of our Lord two thousand ___fourteen_____ .

_Margaret M. Sellm_

Assistant          **Clerk/Magistrate**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM CIV.P.2  1M 11/2011

COMMONWEALTH OF MASACHUSETTS
SUPERIOR COURT DEPARTMENT
SUFFOLK SUPERIOR COURT

SUFFOLK ss                                    Docket no.

_____

MARK G. BULMAN

PLAINTIFF

V.

SANTANDER BANK (SOVEREIGN)

DEFENDANTS

_____

COMPLAINT

INTRODUCTION

COMPLAINT AGAINST SOVEREIGN BANK MORTGAGE (SANTANDER)

FOR VIOLATIONS OF STATE AND FEDFERAL LAWS AND

UNFAAIR AND DECPETIVE ACTS REGAIDING THE ORIGINATION OF THE

MORTGAGE AND SERVICING OF THE MORTGAGE AND AS A THIRD PARTY

BENEFICIARY FOR BREACH OF CONTRACT UNDER THE FEDERAL HOME

AFFORDABLE MORTGAGE PROGRAM (HAMP). FOR FRAUD IN THE

ORIGINATION OF THE MORTGAGE. THE ORIGINAL BROKER FALSIFIED

INFORMATION. ALSO, FRAUDULENT APPRSAISAL TO ARTIFICIALLY

(2)

INFLATE CASH BACK ON CLOSING. VIOLATIONS OF THE MASSACHUSETTS
CONSUMER PROTECTION ACT IN THE ORIGINATION FOR SELLING A LOAN
WHICH THE ENTITY MAKING THE LOAN KNEW OR
SHOULD HAVE KNOWN THAT THE PLAINTIFF COULD NOT AFFORD. THE
LOAN WAS PRESUMPTIVELY AND STRUCTURALLY UNFAIR. FRAUD IN THE
ORIGINATION FOR BASING MORTGAGE APPROVAL ON A FRAUDULENT
APPRAISAL. UNFAIR AND DECEPTIVE ACTS BY LURING PLAINTIFF INTO
ACCEPTING THE MORTGAGE WITH THE ASSURANCE HE COULD
REFINANCE WITHIN A SHORT PERIOD OF TIME. FALSIFICIATION OF
INCOME TO RAISE PLAINTIFF'S QUALIFICATIONS THAT BROKER SHOULD
HAVE KNOWN WOULD QUALIFY PLAINTIFF FOR LOAN HE COULD NOT
REPAY. VIOLATIONS OF MASSACHUSETTS PREDATORY LENDING HOME
LOANS PRACTICES ACT. UNCONSCIONABLE CHARGES FOR SETTLEMENT
CHARGES, YIELD SPREAD PREMIUMS AND VIOLATION OF FEDUCIARY
DUTIES.
THE FAILURE OF ANY ENTITY ATTEMPTING TO ENFORCE
THE OBLIGATIONS OF THE MORTGAGE TO PRODUCE A VALID NOTE
PROPERLY ASSIGNED TO JUSTIFY COLLECTION RIGHTS OR ANY RIGHTS.
  FOR MANY REASONS THE ABOVEMENTIONED
MORTGAGE COMPANIES VIOLATED THEIR DUTIES UNDER THE FEDERAL
MAKING HOME AFFORDABLE PROGRAM (HAMP) TO LIVE UP TO THE
CONTRACT OBLIGATIONS TOWARDS THE PLAINTIFF AS A THIRD PARTY

(3)

INTENDED BENEFICIARY UNDER PARKER V. BANK OF AMERICA. THE

PLAINTIFF APPLIES SEVERAL TIMES FOR MODIFICATIONTHE DEFENDANTS

DID NOT DEAL AT ALL IN GOOD FAITH AND CONSTANTLY LOST

DOCUMENTS

OR DID NOT FOLLOW THROUGH ON THEIR REQUIREMENTS UNDER THE

CONTRACT OR LAWS. THEY FAILED TO NOTIFY THE PLAINTIFFS OF THEIR

STATUS. THEY EITHER ENVER ACTED ON THE NUMEROUS

APPPLICATIONS OR MISTAKENLY TURNED THE PLAINTIFF DOWN. AS THE

ABOVE NAMED CASSE STATES "INERTIA IS NOT AN OPTION" IN DEALING

WITH THE REQUIREMENTS OF THE HAMP. THE MORTGAGEE LACKED

THE MORTGAGE TO RECEIVE ANY MORTGAGE PAYMENTS, SERVICE SAID

MORTGAGE AS THEY NEVER HAD PROPER ASSIGNMENT OF SAID

MORTGAGE;  LACKED LEGAL STANDING TO CARRY OUT ANY

FORECLOSURE ACTION AS THEY WERE NOT PROPERLY IN POSSESSION OF

MORTGAGE THEY CANNOT PRODUCE THE ORIGINAL MORTGAGE NOTE TO

JUSTFY COLLECTION AND FORECLOSURE RIGHTS; ALSO FOR UNFAIR

AND DECEPTIVE PRACITCES AND FOR VIOLATION OF STATE AND FEDERAL

LAWS FOR FRAUDULENT ORIGINATION OF THE MORTGAGE BY FALSIYING

FINANCIAL INFORMATION AND BY GIVING THE PLAINTIFF A MORTGAGE

THEY KNEW OR HAD REASON TO KNOW. HE COULD NOT AFFORD AND BY

OFFERING THE PLAINTIFF A MODIFICATION WHO'S TERMS WERE

UNREASONABLE AND LEFT THE PLAINTIFF WORSE OFF THAN BEFORE.

(4)

ALSO, THE DEFENDANTS DID NOT MARKET THE PROPERTY OR IN ANY WAY ATTEMPT TO PROTECT THE EQUITY OR AS A TRUSTEE FOR THE BENEFIT OF THE HOMEOWNER.

1. Mark Bulman brings this suit, as a Massachusetts plaintiff, to challenge the failure of Defendants to honor its agreements with the borrower to modify the mortgage under the Home Affordable Modification Program, and prevent the foreclosure of his property. He owns the property located at 205 Nyes Neck Road, Centerville, MA.

The plaintiff applied under said programs several times. He was essentially fumbled around several times. He also challenges the origination of the mortgage, which was fraudulent. Both the stated income approval and the appraisal. He also challenges trhe servicing of the mortgage by the above mentioned mortgage companies.

2. Some of the Plaintiff's claims are simple- when financial institution accepts an application to modify a loan to prevent a foreclosure, under the Making Home Affordable Program (HAMP), the lender must treat the application in a non-negligent manner. Foreclosure activity must stop and the lender must follow through and meet the strict deadlines to make a determination. Inertia is not an option. Sovereign (Santander) has violated the Plaintiff's rights as a third party beneficiary under the federal contract between the government and Saxon under the HAMP, as the institution is acting under the purported aegis of a federal program that is specifically targeted at preventing

foreclosures.

3. The Plaintiff's other claims are simple as well- when a large financial institution

(5)

promises to modify a loan to prevent foreclosure who lives up to his end

of the bargain, expect that promise to be kept. This is especially true when the financial

institution Sovereign (Santander) is acting under the purported aegis of a federal program

that is specifically targeted at preventing foreclosures. Also, the Plaintiff was lied to in

the origination of this mortgage. It was a stated income mortgage, where the Plaintiff's

income was exaggerated. The appraisal was also exaggerated to allow for cash back.

There was clear fraud in the origination of this mortgage. Finally, the Plaintiff's many

efforts to correct the mortgage problems and difficulties were never dealt with in good

faith, leaving him worse off than when he attempted to correct the problems. Indeed

Under a recent ruling in Parker v. Bank of America Home Loans, Superior Court Civil

Action Number 11-1838, Middlesex Superior Court, any negligent or intentional

mishandling of modification applications can allow for a third party breach of contract

action against the mortgagee as part of the application under HAMP. The court ruled :

"Inertia is not an option" , meaning that the mortgage companies could be held

accountable for its actions or lack of actions.

4. In October 2008, the major lending institutions accepted billions in funds from the

United States Government as part of the Troubled Asset Relief Program (TARP). They

signed a contract with U.S. Treasury agreeing to

participate in the Making Home Affordable (HAMP) program- a program which

the mortgagees received incentive payments for providing mortgage loan

modifications and other alternatives to foreclosure to borrowers.

5. As a participating server in HAMP, Sovereign (Santander) and others have entered

(6)

into written agreements for trial modifications. The Plaintiff, for his part, three times or

more has applied for modification  The defendants

have ignored their contractual obligations to modify the loan permanently or at least

this is also true for many thousands of mortgagors in the area.

6. As a result, these homeowners are deprived of the opportunity to keep their homes and

cure any delinquencies.  The actions of the Defendants thwart the purposes of the HAMP

program and are illegal under Massachusetts law.  Under Massachusetts Uniform

Commercial Code section 2-301, unless the claimant can produce the original note,

properly assigned, he (or the claimant) has no collection rights and cannot foreclose. As

of this date  Santander Bank has not produced the document.  Also the

Plaintiff claims improper origination of said mortgage In addition the original broker and

lied and did bait and switch with the Plaintiff at the point.  He thought he was getting a

fixed rate mortgage and he did not.  Indeed the broker did deceptive things a the point

of origination.  The broker misrepresented the interest rate changes, the points, closing

costs and other key terms.  In essence the broker, gave the Plaintiff a

mortgage she knew or had reason to know that he (Plaintiff) could not afford. The

Plaintiff was misled at every stage of the process, through slick marketing

techniques and fast procedures that really did not afford him the opportunity to question.

Beyond the usual mortgage fraud, the Plaintiff got some "special" treatment

## PARTIES

7. Mark G. Bulman, the Plaintiff, lives at 205 Nyes Neck Road, Centerville, MA 02632

8. Defendant, Santander (Sovereign) Bank has a principal pace of business and main

(7)

corporate address located at 824 North Market Street, suite 100, Wilmington, Delaware 19801. It also has a Corporate Headquarters at 35 State Street, Boston, MA 02108. Thus a venue in Suffolk County Superior Court is proper.

## FATUAL BACKGROUND

9. Over the past five years the United States has been in a foreclosure crisis. A congressional panel noted that more than one in eight mortgages are currently in foreclosure or default. This is true even now.

10. For several years the number of foreclosures has increased in Massachusetts. There had been more than a seven fold increase in three (3) years.

11. According to 2009 and 2010 and later data there has been an increase of over 500% foreclosure filings since 2004. Despite statements that the real estate market has improved in the past couple of years, the numbers have actually gone up nationwide. By 2013 there was some dissipation of the numbers. However the numbers nationwide remain staggering overall. Permanent relief for the homeowner is still a long way off.

12. Though there has been a decline in the numbers in the past couple of years the number of properties facing foreclosure is still far too high. Very few, if any, homeowners facing the lingering effects of the subprime crisis have seen their problems alleviated.

13. Foreclosures have a detrimental effect, not just on borrowers who lose unique property and face foreclosures, but, also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenues.

14. Massachusetts state legislative efforts were able to temporarily slow the foreclosure

(9)

process in 20101 and later on.  But, soon thereafter, the number of new filings

again rose.  Filings are down in Massachusetts, more because of newer laws than fewer

people facing foreclosure. This showed that the foreclosures were slowed but not

prevented.

15.  Clearly, the crisis is not over.  Economists predict that interests rate resets on the

riskiest of lending products will not reach their zenith for a while.  Remembering that this

crisis was caused by the risky sub-prime scheme of

the financial community, the banks and mortgage companies share the main

responsibility to assist the innocent victims of their gambles.

16.  Congress passed the Emergency Economic Stabilization Act of 2008 and then

Amended it with the American Recovery and Reinvestment Act of 2009("Act").

17. The purpose of this Act is to grant the Secretary of the Treasury the authority to

restore liquidity and stability to the financial system, and ensure that such authority is

used in a manner that "protects home values" and "preserves homeownership" 12

U.S.C.A. sect 5201.

18.  The Act grants the Secretary of the Treasury the authority to establish the Troubled

Asset Relief Program or TARP, 12 U.S.C. sect 5211.  Under TARP, the Secretary of the

Treasury may purchase or make commitments to purchase troubled assets from financial

institutions. id.

19.  Congress allocated more than $800 billion to the U.S. Treasury for TARP 12 U.S.C.

sect 5225.

20.  In exercising its authority to administer TARP, the Act mandates that the Secretary

(10)

of the Treasury "shall" take into account "the need to help families keep their homes and stabilize communities". 12 U.S.C. sect 5213(3).

21. The Act further mandates that any assts acquired by the Secretary that are backed by residential real estate, that the secretary shall implement a plan that seeks to maximize assistance for homeowners and use the secretary's authority over servicers to encourage them to take advantage of programs to minimize foreclosures. 12 U.S.C.A. sect 5219.

22. The Act grants significant authority to the Secretary to use many means to facilitate loan modification and prevent foreclosures. Id.

23. The Act, just as importantly, imposes mandates to implement plans to maximize assistance to homeowners to minimize foreclosures. 12 U.S.C.A. sect 5220

24. Pursuant to this authority, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program. The purposes of this program are: (1) The creation of refinancing products for individuals with minimal or negative equity in their home, called the HARP program. (2) To create and implement of a uniform loan modification protocol or HAMP. This was the program that the Plaintiff was invited to take part in and is at issue here. It is funded by TARP funds and other funds. Under HAMP the federal government gives financial incentives to servicers to make adjustments in mortgage obligations in order to give the mortgagor a fresh start and have payments more affordable.

25. The entity that actually interfaces with the borrowers- including payment processing, escrow maintenance, loss mitigation and foreclosure- are known as "servicers" They acts as agents of the mortgagee.

26. In 2009 Sovereign Mortgage (Santander) became an active participant in the HAMP

Program. They were thus required to evaluate all loans which were more than 60 days

delinquent for participation. In addition, if the borrower contacts the mortgagee, they

are required to review financial and hardship information to see if the borrower is

qualified for HAMP modification.

27. The HAMP modification process consists of two stages, as was done in this case: (1)

As happened here, the servicer is required to gather together all the required financial

Information; and, as was done here, offer the, in this case, displaced homeowner

a trial period. Also, as happened here, the homeowner made the trial payments based

upon a formula utilizing the initial financial information. Generally speaking the

program offers homeowners or occupants payments that are 31% of their monthly

income for the next five years. The Plaintiff over and over again tried to apply and was

told over and over again that the applications were incomplete, despite supplying all of

required documents for verification.   Often times he was not told anything.


28.   As is the case with most mortgage companies Sovereign (Santander) modified only

a small percentage of its applicants. In fact they have modified a small minority of

applicants. The plaintiff faced the same treatment. He was led into a mortgage he could

clearly not afford. He was sold the same bill of goods that thousands of other

homeowners were sold in 2006, at the height of the subprime mortgage scam.

29. The Plaintiff had been misled originally to believe that the rate would be fixed, but,

then, at the closing was told that it would be an 'adjustable rate". He was told by the

Sovereign broker that with a "stated income" refinance she could meet my needs. When

He finally found out that the mortgage would be an adjustable rate mortgage, he was told

that any problems

If they were actually doing that they had to add the total household income and not credit his wife. That would have created the false impression.

30. The Plaintiff could not afford this loan. This loan was presumptively and structurally unfair under Massachusetts law.

31. He was told that his substantial need for more cash- in his case $300,000- was easy to get. And, as indicated before, she told him that he could get the money. If there was a problem later on he could be refinanced before any adjustable rates could kick in. The process seemed backward to the Plaintiff. The broker asked what was needed and the n "worked" the financial information to make it take place. He was self-employed but had a large cash flow

32. The result was not only an interest only mortgage, but, also, an adjustable rate, mortgage. It was clear that the Plaintiff could not afford the mortgage.
Basically, he was sold the idea of taking out the adjustable rate, so he could benefit from the "teaser rate". He was also told to accept the mortgage as a way to qualify for a better mortgage within a couple of years. In actuality this was an admission on the part of the broker that the mortgage was unaffordable and not in his interest.
He was virtually guaranteed that he could refinance within a couple of years. This was in spite of the obvious fact that they could not guarantee that the value of the property would increase enough to justify it.

33. The house appears to have been over appraised. The value was originally set at $2,000,000. However much later at the Plaintiff's divorce proceedings, the actual value was set at $1,200,000. There was no was that in such a short time that the

(11)

value could be so much less.

With this being done to assure that the loan would fly, there was little

likelihood that within two years the value would increase enough to ensure any ability to

refinance. The Plaintiff was left with the impression that he would be avoiding the

higher rates. In fact, had he been aware that he would have any trouble, he would

not have accepted the deal.

34. As indicated before, the broker also apparently falsified the household income. The

Defendants then used this application to close the loans they knew he would not be

able to afford. Under the Massachusetts Predatory Lending Home Loans Practices Act,

by providing high-cost loans without a reasonable belief in the ability to repay creates

a violation   One of the main reasons the Plaintiff can state with somewhat

certainty is that the broker took control of the whole application and approval

process. Years later the Plaintiff figured that the excessive amount of cash back he

needed could only come through an "excessive" appraisal.

35. Finally, the terms and rates are so unfair and oppressive and unconscionable.

very excessive settlement charges were charged.  The broker was paid the Yield Spread

Premium to put the Plaintiff into the more expensive loan.

36. The process seemed backward to the Plaintiff.. He was desperate so he went along

with it. The Plaintiff was asked as to what amount of cash back would be required.  When

he gave the amount, he was told it "would happen".  He had no control over the rest of

the process. Much later on he realized that the process must have been rigged.

37. Clearly, this was part of a scheme to secure high financial return for the Defendant at

(12)

the expense of the plaintiff. The Defendant did not care about the Plaintiff's financial

well-being at all. The Plaintiff did not have to figure out a gimmick to get a mortgage he

could afford. Instead, the Plaintiff was shown indifference by the Defendant, when at

every stage of the process he was over charged, talked

into taking a very bad mortgage, to say the least-, all because the broker saw dollar signs

in providing the Plaintiff with this monstrosity of a mortgage. This effectively

sent the Plaintiff into a several years campaign to attempt to secure stability in a very

unstable series of circumstances. He has not succeeded at this point in stabilizing his

situation

38. This mortgage was not based upon income or property value. Nevertheless; this was

the mortgage he was given.

41. Also, originally, the mortgage company sold to the Plaintiff a loan that they had

reason to know he could not afford. The adjustable rate mortgage was originally at 6.5%

would increase at the rate of up tp 2% at the change date beginning in 2009 to a

maximum of 12.5%.

42. To sell this mortgage to the Plaintiff the broker told him he could

refinance within 3 years or the fixed period. In fact, during this period the home's value

continued to fall. He was not told that everything was connected to the ability of the

home to rise in value, which it was not. The Plaintiff was in a box. He was sold a loan

the lender knew would likely fail, in a market where values were already beginning to

fall. This was a home which was deliberately over appraised to begin with. The Plaintiff

would never have taken out the loan if he had had the proper disclosures and not have

(13)

been misled.

43. The broker/ mortgage lender ignored all documentation of Plaintiff's income he provided. They actually falsified income levels on the Plaintiff's application to justify closing loans that would profit them. However, they knew that he could not afford the loans.

44. In effect, he was given a three year loan, as it was designed to be refinanced before end of the fixed period. In that manner he was provided with a high cost loan without reasonable ability to pay. According to the Massachusetts Attorney General's office these the points and fees should actually have been amortized over the actual 3 years, instead of the longer period to correctly calculate the APR.

45. The Plaintiff was charged clearly excessive amounts. For example, in settlement charges. At the same time the broker was paid a yield spread premium of the same amount for placing the Plaintiff in a higher cost loan in violation of his duties.

46. The Plaintiff ran a "Day Boat" business in the fishing industry. The Plaintiff was facing a severe downturn in business due to federal regulations. He went to Sovereign/Santander for help. He was put in touch with the "Single Point of Contact" Person at the Bank. As his record of e-mails and other documents show, he was transferred around and around to many different persons. Some of whom left. Others ignored his applications. During the 18 months the Plaintiff had 5 different SINGLE POINTS OF REFERENCE. Each asked for the same information over and over again.

(14)

47. In one instance he recorded through e-mails that his application was "shelved"- never even passed on to the proper parties for review. This policy has been highlighted in many studies of mortgage company misuse of the processes of modification. In study after study it was observed that bans were actually ignoring applications and throwing them away. This deliberate avoidance of their responsibilities is intolerable. It is also a direct violation of the HAMP regulations.

48. His next attempt at modification was to re-file the application. After more than 6 months of delays and re-sending of the same financial information over and over again, he was "denied" for unspecified reasons. This is a direct violation of the HAMP regulations.

49. The Plaintiff got so desperate that he actually tried to rent out his home and stay in a camper.

50. Another application for modification ended in a general rejection less than 4 days after it was sent in. The Plaintiff is of the opinion that there was no way that the actual application could have been reviewed and a letter sent out in that span.

51. At his point the Plaintiff went to the Casey Law Firm. As stated before, one of his applications was "shelved" and deliberately not acted on. After many delays and other issues, the application was denied primarily due to the fact that his actual financial situation was overlooked.

52. At this point the Plaintiff's "Single Point of Contact" was Jeanette Cruz. The Plaintiff offered to make regular payments as a show of good faith. She rejected the idea. And, that meant that the Plaintiff would fall further behind. When the Plaintiff reported

(15)

the idea a Scott Hutchins, the director of the program, he denied that such a statement

would have been made. Nevertheless; a record of the conversations with two different

person contradicts his claims.

53. The lack of good faith of the Defendants in giving the Plaintiff a mortgage he could

not afford and then not correcting the problem when they had the opportunity to do so,

has put the Plaintiff in a real bind. He has now received a notice of intent to foreclose

and now faces the immediate likelihood of foreclosure.


COUNT ONE

Breach of Contract/Third Party Beneficiary

54. The Plaintiff restates and re-alleges every allegation above as is set forth here in

full.

55. As described above the TPP agreement sent to the plaintiff constitutes a valid offer.

It is one uniform agreement to be executed by servicers and eligible borrowers.

The TPP is a four page document and 'has the appearances of a contract." Durmic

v. J.P. Morgan Chase Bank N.A., 2010 WL 4825632. at *1(D. Mass. Nov. 24, 2010)

"The TPP characterizes itself as an agreement, contains signature lines for the lender

and the Borrower and includes distinctly contractual phrases such as "under seal" and

"time is of the essence".

56. Indeed, the first sentence of TPP provides:

"If I am in compliance with this loan Trial Period and my representations in Section 1

continue to be true in all material aspects, then the lender with this loan trial period

and my representations in Section 1 continue to be true, in all material respects, the

(16)

the lender will provide me with a loan modification agreement as set forth in Section 3,

that would amend and supplement (1) the mortgage on the property and (2) the note

secured by the mortgage." (SAC, Ex. 7, Bosque TPP) I understand that after I sign and

return two copies of this plan to the lender, the lender will send me a copy of the Plan

if I qualify for the offer or will send me written notice that I do not qualify for the offer."

(id.)

57. Section 2 of TPP states that "Time is of the Essence". In the TPP plan, it then sets

forth the conditions under which the modification would be granted: If prior to the

modification effective date (1) The lender does not give to the borrower a full copy of the

plan and permanent agreement. (2) If the borrower does not make all the payments

under the plan, or (3) if the financial representations made in the eligibility stage are

no longer correct. (id. 2F)

58. Section 3 states that if the borrower complies with requirements in section 2 and the

representations made in Section 1 continue to be true in all material respects, then

the lender will send the borrower a loan modification agreement as necessary to

reflect the new payment amount. (id. 3).

59. The Defendants ignored and lost applications and forced the Plaintiff by their

negligence. Massachusetts in Parker v. Bank of America Home Loans, Superior Court

Civil Action Number 11-1838, Middlesex Superior Court, rules that aggrieved

Mortgagors have a potential third party breach of contract action against the mortgage

Company, if, as happened here the bank negligently or intentionally mishandled any

aspect of the application. In this cased all abut one of the applications were lost or

(17)

misplaced. Information was requested over and over again. In at least one instance the
application was intentionally mishandled and shelved.

60. Even though this is a federal program, the Plaintiff has standing to vindicate his
rights under state contract law as here. There are issues of fraud and other issues as well.

61. To establish a breach of contract, Plaintiff must allege that there is a valid contract,
that the Defendant breached its duties under its contractual duties, and, that the breach
caused the Plaintiff damages. Guckenberger v. Boston University, 957 F. supp. 306,
The elements of a valid contract are offer, acceptance, and an exchange of consideration
or a meeting of the minds. See Vadnais v. NSK Steering Systems, Inc., 675 F. Supp.
$2^d$ 205, 207 (D. Mass. 2009). This is clearly the case here. The TPP documents were
valid offers and the reassurances by the mortgage company were also. The signatures of
the Plaintiff and subsequent monthly payments, is an acceptance."Time is of the Essence"
for the offer according to the documents. The HAMP guidelines indicate the agreements
as an offer, which is accepted by the making of the monthly payments and signature.

62. There is consideration here. Consideration is a "bargained for exchange where
there is legal detriment of the promise or corresponding benefit for the promissory"
Durmic, 2010 WL 4825632, at *3. This detriment goes beyond mere monthly payments.
Plaintiff was required to provide documentation of current income, make legal
representations about personal circumstances and undergo credit counseling. These are
all are legal detriments that flowed from acceptance. Wit v. Commercial Hotel Co., 253
Mass. 564, 572 (1925)

58. Plaintiff has suffered severe damages. More importantly he was forced to file for

(18)

modification approximately 3 times and lose and

waste more than three years of his life. And, this was the case for him only to be told

that forms were lost on many occasions, not received or similar things.

59. By executing and returning the agreement to the Defendant, along with supporting

documents, Plaintiff accepted Defendant's offer.

60. Alternatively, Plaintiff's return of the TPP agreement constitutes an offer.

acceptance of this offer occurred when the Defendants accepted Plaintiff's

documents and information.

61. Plaintiff's submission and documentation provided to the Defendants provided

detriment and thus consideration.

62. Plaintiff and Defendants thereby formed valid contracts.

63. To the extent that the contracts were subject to a condition subsequent defendants

opportunity to review the documentation when it was returned to them. This condition

was waived by Defendants and/or estopped to assert it as a defense.

64. By reneging on it stated commitment and assurances; and, by failing in the final

analysis to follow through on its commitments, the Defendants have breached their

agreement with the federal government and the Plaintiff and both directly and as a

third party beneficiary of the federal agreement Parker v. Bank of America Home Loans,

Superior Court Civil Action Number 11-1838, Middlesex Superior Court, are entitled to

sue for breach of contract as a third party beneficiary under the HAMP

And fraud and to stop any foreclosure.

65. Plaintiff stands ready, willing and able to CONTINUE to perform under the

(19)

any agreement to review for modification.

66. The Plaintiff has suffered real harm by the Defendant's breach. This is the
Plaintiff's and family's home. He has struggled for years to keep the home. Plaintiff
is much worse off than before he entered this agreement to apply under HAMP

## COUNT TWO

Breach of Implied Covenant of Good Faith and Fair Dealing

67. Plaintiff repeats and re-alleges every allegation above as if set forth herein in
full.

68. Defendant is obligated by contract and common law to act in good faith and to deal
fairly with each borrower.

69. The purpose of the covenant is to guarantee that the parties remain faithful to the
intended and agreed expectations of the parties in their performance Uno Restaurants,
Inc. v. Boston Kenmore Realty Corp. 441 Mass. 376 (2004).

70. Defendant has routinely and regularly breached its duty of good faith and fair dealing
By:

a. Failing to perform loan servicing functions consistent with its responsibilities
to plaintiff.

b. Failing to properly supervise its agents and employees including, without
limitation, its loss mitigation and collection personnel and attorneys;

c. Routinely demanding information already in its files.

d. Making inaccurate calculations and determinations of Plaintiff's
eligibility for modification.

(20)

e. Intentionally and negligently failing to follow through on any segment of the process to Plaintiff.

f. Failing to follow through on written and implied promises

g. Failing to follow through on contractual obligations and

h. Failing to give permanent HAMP modifications and other foreclosure alternative to qualified Plaintiffs.

71. As a result Plaintiff has suffered significant damages and may lose his home.

72. "Every contract implies good faith and fair dealing between the parties to it. The covenant of good faith and fair dealing requires that neither party shall do anything that will have the affect of destroying the or injuring the right of the other party to the fruits of its contract." T.W. Nickerson Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-570. (2010) the Defendant clearly acted with dishonest purpose or conscious wrongdoing necessary for a finding of bad faith and unfair dealing. If there ever was a case where this rule applies, surely, it is this one. Also, as in Speakman v. Allmerica Life Ins. 367 F. Supp. 2d 122, 132 (D. Mass. 2005). "(The court in looking at this rule, must consider whether "the challenged conduct conformed to the reasonable understanding of performance obligation as reflected in the overall spirit of the bargain." To say the least by dishonestly reneging on the contractual obligations in this case, the Defendants clearly did not act reasonably at all.

II.  Violation of Duty of High Good Faith and Trusteeship

73. The sale of the residence, if allowed, would be a violation of the duty of the mortgagee to act in strictest good faith and trusteeship. Defendants failed to

(21)

respond to the numerous attempts by the Plaintiffs to resolve mortgage issues and

delinquencies and failed to respond to the Plaintiff's requests and acted in bad

faith by proceeding forward toward foreclosure and other actions, leaving Plaintiff to his

detriment. Defendants failed to act even in basic good faith and use

reasonable diligence to protect the interests of the Plaintiff. Plaintiff was only several

months behind, initially, and the defendants did not even try to follow through

on a basic forbearance agreement or modification as promised. After literally dozens

attempts to work with many "representatives" of many mortgage companies,

Plaintiff was in much worse shape than before he tried..

IIII. Failure of Defendants to Act in Good Faith and Use

Reasonable Diligence to protect the interests of the Plaintiff

74. In Robert H. Strayton v. Champion mortgage, et al, United States Bankruptcy Court,

District of Massachusetts, Adversary Proceeding #06-01394. (2006),

Judge Somma outlines the criteria to determine whether or not the mortgage company

practices good faith and uses reasonable diligence to protect the rights of the

mortgagor while proceeding forward with an auction. "It is well-established that under

Massachusetts law a foreclosing mortgagee must do more than comply with

the procedures prescribed by statute...The foreclosing mortgagee must also act in good

faith and use reasonable in conducting the foreclosure sale.: (See

Memorandum and Order of Judge Robert Somma, Strayton, at page 4) "More

importantly, the diligence not done is persuasive...: no marketing, no appraisal, no

real estate broker contact, no inquiry into the market regarding either value or

(22)

prospective buyers, no inspection effort. Moreover is the foreclosure sale is

completed significant value will be lost to the estate."(see Memorandum and Order of

Judge Robert Somma, Strayton, at page 4.)

These words also apply to this case. As stated in other parts of this complaint, none of

the above was done here as well. Nevertheless, the foreclosure process has

begun.

75. There is the added factor here that the mortgage company through trustee will try to

repurchase the property auction. According to Snowden v. Chase

Manhatten Mortgage Corporation et al., (17 Mass. L. Reporter 27; 2003 Mass. Super.

LEXIS 398), when the mortgage company also attempts to repurchase the

property at auction; "it will be held to the strictest good faith and utmost diligence for the

protection of thr rights of the principal." (Snowden, 17 Mass. L. Reporter

27 (2003) at 29). Since Defendants always try to repurchase said property at auction, it

owed the Plaintiffs more than just the minimal statutory requirements for

compliance, the Defendants owes the Plaintiffs the strictest good faith and trusteeship by

modifying the terms of the oppressive mortgage, based upon

misrepresentations, and any other effort that would have protected the equity. At the very

least, the facts indicate that the auction should be prevented from

occurring. In virtually all cases, the foreclosing Trust , on behalf of the mortgagee,

attempts to repurchase at auction.

76. The Massachusetts Attorney General's Office has investigated many nation-wide

mortgage servicers for their practices. In spite of these numerous efforts and

(23)

recommendations by the Massachusetts Attorney General's Office, Mortgage Electronic

Registrations Systems, Inc., and others routinely fails to give customers information on

the amount and purpose of the discount points and fees imposed on the loans.

Representatives of the mortgage companies at the point of origination made false

statements regarding loan terms and charges, material costs of the proposed loans,

whether the loan included escrow payments and insurance payments and the

insurance payments, the willingness of the mortgage company to refinance at a later date,

misleading statements regarding prepayment penalties. Plaintiff did not get

any sheet before the closing listing what the expenses would be at closing. Furthermore,

in this case, a fraudulent appraisal was done to secure a mortgage deal

worth more than the property itself. All of this happened here.

77. Representatives ignored written disclosures required to be made by the Consumer

Credit Cost Disclosure Act, the Truth in Lending Act G.L., 184, chapter

17D and the real estate Settlement Procedures Act, including, but not limited to the Good

Faith Estimate of Closing Costs. Defendants either misrepresented costs

or disparaged the accuracy. The Yield Spread Premium paid by the various mortgage

companies to its agents encouraged agents to charge borrowers above the

wholesale par rate what the borrower qualifies for. Financial incentives such as this

allowed brokers to charge homeowners higher than they could afford.

Defendants by information and belief have utilized these incentives in the past and

probably at the time of origination of this loan. None of this was explained to the

Plaintiff. The plaintiff was directed to take a loan that was not in his best interests. It

(24)

was a loan she could not repay despite a heroic 3 year effort. This "package"
was deliberatively sold to him as his "best option".

78. There were virtually no standards regulating the broker's behavior. Despite the
presence of an attorney at the closing, no questions were effectively answered
. None of the deceptive outlined were scrutinized or corrected. When the Plaintiff
attempted to ask questions he was given a 3 year run around.

79. This combination of fraudulent origination and procurement of loan behavior,
fraudulent appraisal, combined with insincere efforts to straighten out the problems
later and of course with the mortgage company's lack of marketing of the property, could
cause the Plaintiff to lose his property and residence. They indeed may

have been targeted as easy marks as it claimed in many of the Massachusetts Attorney
General's office.

80.The various actions and inactions and nondisclosures outlined above violate the:

(I.) The federal Truth in Lending Act 15 U.S.C.  1601, et seq., and the
Massachusetts counterpart, The Consumer Credit Disclosure Act, c. 140D. These
statutes require, among other things, that the lender provide the borrower about the
actual costs of the loan in a timely fashion. This did not happen here.

(II) The federal Real Estate Settlement Procedures. 12 U.S.C.  2601, et seq., and
the Massachusetts counterpart. G.L. 184 17D (c) (1). These statutes
require, among other things, that a lender provide advance disclosure about costs of a
mortgage loan so that the borrower may compare  available rates and terms

(25)

from one lender to another to get the most favorable terms.

(III) M.G.L. c. 183 63, which requires that the lender make clear to the borrower
the points it charges to a borrower. This did not happen here.

(IV) In addition, Defendants have been in violation of Chapter 268 of the acts of
2004 under MGL Ch. 183 Section 28C, the Act Prohibiting Certain
practices within the Mortgage Home Lending Market, by selling a mortgage that was
clearly not in the Plaintiffs best interests.

(V) The Attorney General of Massachusetts has completed an upgrade of rules
and regulations concerning mortgage lending practices in
Massachusetts. The Attorney General now insists that all of these origination violations
should all along have necessitated voiding these mortgages due to the fraud.
See 940 CMR 8.0. The United States Congress has proposed legislation in, House Bill
No. 3913, outlawing Yield Spread Premiums (YSP)

(VI) In the case of Snowden V. Chase Manhatten Mortgage Corporation, et al, (17
Mass. L. Rep. 27; 2003 Mass., Super Lexis 398) the Massachusetts
Superior Court went even a little further that requiring normal good faith and reasonable
diligence when the mortgage company conducting auction also attempts to
purchase the property at same auction. This is virtually always the case. When these set
of facts occur, the Court quoted a series of prior decisions in concluding
that the mortgage company becomes a trustee held to the highest standards of good faith
and utmost diligence for the protection of the mortgagor/homeowner. One
of those strict standards is clearly protecting the equity of the homeowner. By doing

(26)

nothing to market the property or very little to assist the Plaintiffs to modify

the oppressive terms or complete a successful forbearance, Defendants clearly fell far

below these standards. If there ever was a case of individuals being targeted

and tricked and being hung out to dry, this was it.

VII. Based upon a series of class action lawsuits filed by Attorney General of

Massachusetts, some referred to above, a new theory of the relationship between

mortgage companies and their "prey" in this state. It is clear from the fact patterns here

and elsewhere that "unfair and defective mortgage "were hoisted upon an

unwary public. As the marketer of these defective products. and others should be

required to pay the price for their adverse efforts.

IX. Article 3 of the Uniform Commercial Code Sect 3-301 indicates that clearly the

mortgagee and its assigns lack standing to do anything here. The cannot produce the

original not properly assigned note and cannot claim the status if agent for the note

holder. The same thing is true for U.S. Bank National Association

X. The Plaintiffs are clearly third-party beneficiaries of the federal HAMP contract

between the abovementioned mortgage companies and the federal government. To

enforce the contract the Plaintiffs must be and clearly are, "intended beneficiaries" In

this the performance required of the servicers who entered into the HAMP (SPA)

agreement was intended for the direct benefit of borrowers struggling to pay first

mortgages on their residences, with the hope of additional but incidental benefits

accruing to the economy as a whole. Denying of the third-party beneficiary status to

aggrieved by violations of HAMP would mock the very goals of the program that the

(27)

contract was intended to further. In the plaintiff's affidavit there is alleged a lengthy

period of lost and re-submitted paperwork. The mortgage company, after stating that

they were "qualified for HAMP". However, no verification was given. Instead, the

Plaintiffs were told time after time that paperwork was incomplete or that deadlines

were passed. The Plaintiffs applied at least 3 times. They responded quickly to

every request for re-submission of information or additional information. In every case,

they were told that the information had not been received or that deadlines were passed.

While this was going on collections calls continues, letters were sent and the mortgage

company moved closer and closer to foreclosure.

Inertia is not an option. The servicers are given specific time limits to respond.

Decisions must be made on a quick and definite basis. Regulations are clear. Specific

duties and responsibilities are owed the homeowners by the mortgage companies. The

plaintiffs were not treated fairly. Based upon this reasoning, the plaintiffs lay a claim of

contract fraud. In this matter plaintiffs relied on statements and claims made by the

Defendants that were wrong or that the Defendants had reason to believe were wrong.

The plaintiffs relied on these statements to their detriment. And, Breach of Contract:

(1) The Defendants by failing to comply with the federal HAMP guidelines breached

their contracts with the Plaintiffs for mortgage servicing/and/ or lending, and (b) the

Plaintiffs, as demonstrated before, are third-party beneficiaries of the defendant's contract

with the federal government under the HAMP program, which contract the Defendants

have clearly breached. See Parker v. Bank of America, Civil Action No. 11-2838,

Middlesex Superior Court.

(28)

XI. Under Chapter 93-A the Plaintiff was subjected to unfair and deceptive acts. In

Commonwealth v. Fremont Inv. and Loans, 2008 WL 2312648 (Mass.App.Ct.2008).

It was stated that approval should be based upon the homeowner's ability to pay.

In the same case, a formula was given to determine the presumptive unfairness of a loan;

An adjustable rate with a two-year fixed. A teaser rate that was 7% below the fully

indexed rate. The debt-to-income ratio at the fully indexed rate of the loan would

have exceeded 50%. And, with a second mortgage a loan–to–value ratio of 100%

All of this was done here.

Also, the plaintiff was misled into believing that he could refinance within the fixed

period. As it was not explained that was dependent upon market value. In the same case,

ibid Commonwealth v. Fremont Inv. and Loan it was made clear that is it unfair to tell

people to purchase the loan with the understanding that it could be refinanced

in a short period of time. This is an admission that the mortgage is unaffordable and

not in the Plaintiff's best interest. Furthermore, recent Massachusetts cases have added

caveat that when there is an adjustable rate mortgage, the MORTGAGE SHOULD BE

TREATED AS TWO SEPARATE MORTGAGES. IF THE MORTGAGR CANNOT

AFFORD THE MORTGAGE AT THE FULLY INDEXED RATE, THEN THE

MORTGAGE IS NOT IN HIS/HER BEST INTEREST AND THE SELLING OF IT IS

AN UNFAIR AND DECEPTIVE ACT. This clearly was the case in this instance.

(29)

## PRAYER FOR RELIEF

WHEREFORE, The Plaintiff respectfully requests the following relief:

A Enjoin Santander Bank or any other entity from

foreclosing on the property at 205 Nyes Neck Road, Centerville, MA 02632.

B. requiring that ANY entity be required to produce the original note properly

assigned to establish their collection and/or foreclosure rights under the mortgage. As a

substitute an affidavit probing that they are operating as the agent of such an entity is

required.

C. Enter a judgment declaring that the acts and practices of the Defendants

complained of herein to constitute a breach of contract and a breach of the

covenant of good faith and fair dealing. And breach of contract for a third party

intended beneficiary

D. Order the Defendants not to interfere with the use, occupancy

and enjoyment of the property at. 205 Nyes Neck Road, Centerville, MA 02632.

E. Grant a permanent and final injunction enjoining the Defendants and agents

employees, affiliates and subsidiaries from continuing to harm Plaintiff.

F. Order specific performance of Defendant's contractual obligations together

with other relief required by law and contract and law.

G. Award actual and punitive damages to the plaintiff for breach of contract

and fraud.

H. Award the Plaintiff the costs of this action, including the fees and costs of

any experts called, together with reasonable attorney's fees. Also, repay Plaintiff

(30)

all monies paid to Defendant.

I. Grant Plaintiff such and other and further relief as this Court finds necessary

and proper.

DATE: March 11, 2014

                                  Respectfully submitted
                                  On behalf of the plaintiff
                                  Mark G. Bullman

                                  _____
                                  Robert K. Cabana BBO 641885
                                  1354 Hancock St., Suite 206
                                  Quincy, MA 02169
                                  Tel no. 617-405-4283
                                  Rkc6068@aol.com

AFFIDAVIT OF MARK G. BULMAN

I, Mark G. Bulman take oath and swear the following

I am the owner of the property located at 205 Nyes Neck Road, Centerville, MA 02632. In December of 2005 I had encountered some financial problems as the result of a divorce. At the time I was in the seafood industry. At first I went to a mortgage broker for assistance on refinancing my mortgage. However, the closing costs and points were ridiculous. So I approached my bank, Sovereign (now Santander). Initially I spoke with a commercial loan officer by the name of Steve Cronin. After explaining my situation to him, he suggested to me that I meet with a Sovereign residential mortgage specialist. I do not remember her name. However, she contacted me and set up a meeting to discuss my matter. After a short initial meeting she immediately filled out paperwork and appropriate forms. During the application process she stated to me that she could get me a refinance on "stated income" without any necessary verification. Furthermore, she was convinced that any new mortgage she could procure for me, would meet my needs. As part of her sales process, she told me that if I had any problems with the mortgage, it could be refinanced pretty quickly. The broker handled the entire application process. I was in the need of an extensive cash back ($300,000). She told me that it would be "no problem". She even went so far as to state that: "It could be transferred to a fixed rate mortgage without penalty" later on.

The process seemed to be backwards to me. She first asked me about the amount of cash I needed. She then worked the financials. Later on, after much time, I realized that she did the process backwards to make the numbers work out. I did not realize it at the time. The broker filled out the application and crunched the numbers. Only later on did I realize how horrific this was. At the time I was self-employed, with a large cash flow. Given that, I expected that there was plenty of room for speculation

(2)

about my future income. I was not even directly involved in the appraisal. In 2004 during the divorce,
the attorneys for both sides indicated that the house was valued at about $1,200,000. Surprisingly
barely a year later the house was valued at nearly $2,000,000 according to bank's appraisal company.

I questioned in my own mind how that could be. But, I figured that the bank knew what it was doing. I
now realize that the appraisal was probably inflated to meet the cash back needs. There was no way the
property could have appreciated that amount in such a short time.

So here I was being considered for a mortgage which was not in actuality based upon my income; and,
was not even based upon my property value. At the time it did not strike me as wrong. I was told that
this was the way that things were done. Now I know that it was in actuality a "scam" to get the job
done. With the numbers falling into place, I was able to get the cash I needed and at least some kind of
refinance. Nevertheless; I was clearly sold a mortgage that was destined to fail. Being confused and
desperate I went along with the advice. When I was told that the mortgage was not fixed but adjustable
rate regarding the interest, I was assured by the broker that I could get a new mortgage at a fixed rate
before the adjustable period kicked in. In affect I was being told that I could escape the adjustable
period. To me they should have known that I could not afford the mortgage as structured. This was
also a mortgage I could never have obtained through regular standards. I only wish I was more aware of
this at the time I took out the mortgage. The Sovereign broker met with me to sign the closing
documents. The process went pretty fast. Little if any questions were dealt with.

Unfortunately, my seafood business had experienced a downturn over the past 8 years. New
regulations on catch limits put a great strain on my operation. The income significantly decreased.

My projected income also decreased dramatically. My business was as a broker for "Day boat" fishing.

(3)

In affect I wasa broker for 100 boats. So the new regulations hit my business one hundred time over.

Even, selling the business was not a realistic option, as the regulations dramatically altered the industry and curtailed business dramatically curtailed business.

Needless to say, this income change, combined with the adjustable rate mortgage I was given, put me in an immediate bind. I was not in a position with my home to refinance as I originally was told I could. A short sale was not an option at that point either.

Instead, I was forced to seek other solutions, imperfect as they were. At first, I tried to rent the home during the summer to take in extra income. The bank allowed me to do this. I was staying in a camper.

In August of 2012 I notified Sovereign Bank that due to my current financial circumstances I needed some assistance to maintain my home. At first I got limited response. Eventually I was put in touch with what Sovereign called their "Single Point of Contact" program. As my e-mail trail shows the individuals I was put in contact with tended to disappear one after another. In one case, e-mail shows my application was "shelved". After assurances that another office would complete the application process, I was then told that the file was moved to Pennsylvania and expired. In other words they NEVER looked at my application. I now know that this is a violation of the laws regarding the modification programs. I did not know this at the time. This incident happened after I went to the attorney- see next page.

So I was forced once again to file a brand new application for modification. After considerable delay it was "denied". This was due to the fact unmodified the numbers did not quite work. It was enough to cover the mortgage but not to leave a surplus. Certainly, with a slight modification, things would have worked out perfectly.

(4)

For over 18 months I put in application after application for modification. I believe 5 in all were completed. As such I was given nothing but a run around. Paperwork had to be resubmitted. Applications were lost. Also, during this time I was sent to FIVE DIFFERENT "SINGLE POINT OF CONTACT" REPRESENTATIVES. Each one asked for the same information over and over again. Therefore, I was in worse circumstances after a year-and-a-half of trying, than before I begun the process. Finally, I somehow at least made it into the "review" process. Four days later, by telephone, I was told that I was "denied". How they could deny me in 4 days, baffled me. Believing that my application was not really reviewed adequately, I sought out the assistance of an attorney. Nevertheless, the attorney was also put through a similar process of delay and confusion. Paperwork was lost. In one case as stated before, it was deliberately not looked at and "shelved".

The Casey Law Firm of Harvard, Massachusetts, through the paralegal, Ann Valencourt, submitted 2 applications on my behalf. As indicated before one was deliberately not acted upon. The second time it was denied, as major factors in my financial circumstances were overlooked. Once again, upon bringing it to the attention of my "single point of contact" I was to resubmit the application again. Please refer to the attached e-mails.

To keep my options alive during this incredible process, I offered to make regular mortgage payments. My new single point of contact was Jeanette Cruz. She told me they would not be accepted; and, tpo wait for the modification, I then called and spoke to Scott Hutchins, Director of the program. He told me that she was mistaken. Sovereign would "never" turn down payments. In fact, he believed that no agent would have told me that. I told him that I had a record if it on e-mail. He told this also to the paralegal, Ann Valencourt. She asked for the minutes for the recorded conversation and was denied them.

(5)

After all of this, and another application, as requested, I received a "letter of intent to foreclose". I am now in a total tailspin. I am desperate to save my home. I am making more than enough income, that with a modified mortgage, I could easily afford to pay. I did everything in my power to go above and beyond to cooperate with Sovereign and meet all of their expectations. As this affidavit clearly shows, I indeed provided the bank with everything they needed. Also, I am of the opinion that I showed the proper ability.

What I received in return was the run around and bad faith dealing. Sovereign chose to ignore, mishandle and disparage all of my attempts to comply with the modification on multiple occasions.

I clearly gave to them all that was required and more. The wrongdoing was not on my part. I want to save my home and property. I need the help of the courts to achieve this process, as the bank had shown time and time again that it will not work with me in good faith.

Signed under the Pains and Penalty of Perjury this Twenty-Seventh Day of February in the Year 2014

_____

Mark G. Bulman